Okay, our next case this morning is number 17-15-15, Douglas P. Fleming, LLC, v. Secretary of Veterans Affairs, Mr. Wise. May it please the Court. Good morning. And I apologize for my voice, I'm fighting off a bit of a cold. We're here on an issue involving contract interpretation, which as this Court knows is something that this Court considers de novo. The issue is relatively simple. If you look at the contract, this was a contract to paint and patch the 2-D halls and walls. Even if you assume that the 16,800 figure is directed toward the area of wall painting, isn't it clear that it was at most an estimate of the total area to be painted? The original bid, it was an estimate of approximately 16,800 square feet of paintable surface. That is what was asked at the pre-bid conference. And it was answered, and all the bidders, not just my client, DPF, they asked if they could go back and take more accurate measurements of the specific groups. Are you saying that it became something other than an estimate in the final contract? Not in the final contract. When the modification, number one, yes, as modified, it was definitely, the approximate was taken out of it. And let's, if I could just, and I don't, certainly. That would be kind of an odd contract to say that, you know, you paint 16,800 feet and then you stop, even though you haven't finished painting all the rooms and halls, right? I would agree if all of the rooms and all the patient rooms and all the halls were part of the contract. I'd agree with you, but that's not what the contract said. The contract said, paint and patch the 2-D halls and walls. And there was a lot of conversation in the underlying opinion about, well, it wasn't really a painting contract. It was more of, you had walls, you had floors. It is true that there were floors part of the original contract, but this was always the paint and patch. That was what was included in the first paragraph of the solicitation, which was ignored by the Board of Contract Appeals below. So if we were to disagree with you and say that this was an estimate, you would lose, right? No. No, I would, I don't believe, I believe, let's, if I could break it down. The original contract included 16,800 square feet, which was approximate. What was that, a set number or not, we don't know. When we submitted our bid, if you were to look at- No, but what I'm asking you to do is to assume for the moment that we conclude that the 16,800 number was an estimate rather than a definition of what your obligation was. You wouldn't lose because you had information in the ACM report to calculate what the actual score for it was. I respectfully disagree, and let me tell you why. Because we were never told that it was going to be all of the rooms in 2D. We had, in fact, if you look at the ACM report, there are rooms that are identified that were never painted. And there are rooms along 2D that were never painted. So how can, at the end of the day, we be held liable for painting all of the rooms in- I'm sorry, there were patient rooms that were not painted? Correct, Your Honor. There's, if you were to look at- Was this in the briefs, this reference to the patient rooms not painted, not subject to being painted?  Yes. Let me, yes. It's addressed in the footnote one in the reply brief, Judge Dyson. It references Appendix 805, which highlighted which patient rooms and corridors that were ultimately painted. And if you go to Appendix 805, I could just show you, it's 805, Your Honor. No, no, no. In the reply brief. This is saying that not all of the rooms were patient rooms, but presumably all of the patient rooms were required to be painted. Isn't that right? No, Your Honor. I would submit that- All right. Well, let's see. What have you got? 805. 805. It identifies what rooms were actually painted. And if it's not highlighted, I'll wait for you. And if you were to look at it, it starts, it shows, and it's handwritten in green, you can see room number 102. It's got 860 square foot of paint, but the room above it, 100, was not painted. If you go down to the bottom room, 111 was painted, 940. But then you turn the corner, and it picks up room 118, 119, 120. But it skips two patient rooms right there on the corner, and at the end- What are we looking at here? This is a description of the work that you did? Yeah, this is a calculation of the rooms that were actually painted, and a calculation of the specific square foot of paintable wall space. How do we know that the VA said don't paint these rooms? I mean, we know from what you just said, let's assume that the rooms were not in fact painted. What was the evidence that they weren't supposed to be painted? We were never advised what rooms would be painted or were not painted. We were told when to paint certain rooms. The problem is we were never given clear direction that you're going to paint. In fact, at the beginning of the job, they never told us that- These patient rooms that are shown as unpainted on this exhibit. Indirectly, yes. They didn't say paint these rooms. In fact, how we were given instructions, how DPF was given instructions were it was never that you were going to paint rooms 102, 103. Instead, it was said, all right, you're going to paint rooms 102 this week, 102, and we'll go over to 213 or whatever the number. I don't know exactly which ones. You didn't say you completed the job even though these rooms were painted. Yes, at the end of the job. Where did they say that? In the final cure notice, when all of the rooms had been painted on here, except the ones that were highlighted, the cure notice which specifically instructed us to finish all work, directed us to finish all work within 10 days, listed only unpainted corridor work. They never said you have to come back and paint room 100 or the other different rooms that were not painted. At the beginning of the job, Judge Bryson, I believe you asked me, why couldn't you, or Judge Dyke, I apologize. He said, why couldn't you go through the ACM report and figure out what you're going to paint? If we had been told at the very beginning or at any time that these are all of the rooms you're going to paint, he could have gone down and calculated exactly, said, all right, the paintable square foot is going to be, in this case it turned out to be 36,880 square feet. If we knew that these were all of the rooms that were going to be painted, and you can see those calculations that it's summarized over on the right-hand side, that is a problem. We were never given clear, DPF was never given clear instructions that these are the rooms we're going to paint. Instead, it's an operating, it's a hospital, so you're going to take furniture out of each room and then paint it. Let me tell you what it is that troubles me about your case. That is the document that shows up, I think, on 848 of the appendix that was sent by a DPF in response to an inquiry from the VA as to whether your capacity to produce the, to complete the contract at the bid price. There was a back and forth of a couple of times before the contract was awarded. And there, even though the solicitation referred to 16,800 square feet, you have at item 4, patient rooms painting approximately 18,000 square feet, acknowledging that more than the 16,800 just to do the patient rooms. And then on item 3, you acknowledge the obligation to paint the corridors, which is extra square footage. So it seems to me any argument that you were somehow limited to 16,800 is contradicted by this, isn't it? Looking at it blindly, yes, Your Honor. But if I may, this is, was submitted, this document shown in exhibit 848, was submitted to establish the schedule of values for the contract. If you look at... It was submitted before the contract was led by DPF and indicated what, presumably, DPF's understanding of its obligations and costs would be, correct? I believe exhibit 848 was submitted after the job was, was led. If you look at exhibit 8... It suggests that it was submitted on June 22nd, right? And that the job, I think, was not awarded until some days after that. I don't remember the exact date, but I think it was after the June 22nd. If... I don't have the exact date in front of me, Your Honor, when this was submitted, but I will say this. If you go to exhibit 858, which is an email, two pages beyond, where Doug Fleming responds to Contracting Officer Butt's inquiry into the total cost and about the bid, and his email to Ms. Butt states in the second paragraph that the overall project consists of approximately 10,000 square feet of vinyl floor, towel removal, and replacement of approximately 16,000 to 20,000 painting and 30,000 to 40,000 in electrical work. Yes, but that was June 13th, and the document we've been discussing was June 22nd. So this more recent document, which is a more complete breakdown, looks like a more updated understanding by DPF as to what the scope of the work was, isn't it? Well, actually, I don't dispute that, Your Honor. In fact, if you were to look at it, the estimate, and we're only talking about if this, in fact, is 6-22-2012, the only reason I don't have a date on the document, that's the only reason I'm hesitating on it. Well, I went through the documents, and that was my best take on it about the date, because it's attached to a correspondence of that date. It's within the same week of this original proposal. This response to the government saying your bid's too low, and we tell them that we think it's between 16,000 and 20,000 of square foot, and then a week later, they send in schedule of values putting 18,000. I think it's all... 18,000 for the patient rooms, but not counting patient corridors, which was separately itemized as to include painting. Yeah, I don't... Your Honor, I think the... I can see how you would view that, if you're viewing that 18,000 square feet. I believe 18,000 square feet was an approximation between the 16,000 to 20,000 that DPF assumed, and was the value of the contract when it said approximately 16,800 square feet. He had conversations with this particular CO, Karen Butts, who never testified at the hearing below, and specifically agreed that the paintable square foot is approximately 16,800. My client was... What about the board's alternative holding that you failed to prove your damages? The... I don't believe that they really gave it much... They did not give the damages any consideration, Your Honor. They looked at this as an issue that the... But there is an express statement of an alternative holding, which may be brief, but brevity might be understandable, when the point is, we've looked at what you've given us. You've just not given us anything reliable, so even if we could claim some damages for the disparity between 16,800 and 36,800, you haven't given us a reliable way of measuring what more you should be paying. Why isn't that sufficient? Maybe, at least for claim 36,600. Maybe not for 36,600. For 36,600, Your Honor, it's the... The ACM report, which was how the 36,600 was priced, was a... It was very detailed, very... It's not a document that... You didn't address this in your opening brief, did you, this alternative holding? We did, Your Honor, not in detail. Where? It's in the... In page... When we asked for the full 477,000 of the claim, on page 55, the conclusion. I acknowledge we did not go through specifically... That's not sufficient. Even... You referred to the ACM, so maybe the ACM gives you the square footage. That's only one component of one possible way of proving what money you want, but it's only one component, and the board may have suggested that might not have really even been the best way to do it anyway, just give us labor and materials or something, but even if it's one component, you don't show the work to say, multiply that by what and how you derive it. The... In the trial court below, Your Honor, or the hearing before, there was a detailed explanation as to how it was priced based upon the ACM, and the exhibit... Do you have that exhibit, the detail? Yes, I believe you do. This is not 408? No, it's... I've got the original trial exhibit, calculation of it, Your Honor, and I believe that is... I apologize. I believe it is... It started out as Exhibit 36, but it was modified to Trial Exhibit 82, and then Trial Exhibit 84. They are not in the joint appendix, but they were submitted below. I will... They were admitted as evidence. If you're going to attack what is stated as an alternative ground, that even if you're right about the meaning of the contract, the methodology was unsupported, how do we assess that without being even told what the methodology was? Well, I think you're... With the proper course in this case, it was clear that the judge below committed an error in interpreting the contract and everything else, and they did not really give it a full and detailed explanation looking at the way the damages are calculated. We asked for a total of $477,000 for that claim, and I do admit that there is a... I believe it's a sentence in the opinion saying... I mean, it's there. I acknowledge it. But I don't believe it was given clear... There was no substantial basis to say that there's no substantial support because the opinion as a whole spent its entire time trying to make an interpretation that 16,800 square feet was immaterial. Okay, I think we have your point. We'll give you two minutes for rebuttal. All right, thank you very much. Ms. Kaprosky, is that how you pronounce it? Kaprosky, yes. Good morning, Your Honors, and may it please the Court. The last discussion that you were just having with my colleague is exactly the heart of what is wrong with DPS's claim in this case. There are multiple factual findings, particularly on the painting claim that you were just discussing, as well as on the other claims that DPF has presented, that DPS just utterly failed to address in any sort of substantive detail in its opening brief, and are factual findings that this Court must give certain deference to. I did not read the Board as having said about Claim 3662 what it said about Claim 3660 with respect to the improper or insufficiently persuasive methodology. Your Honor, I would refer you to APPX 16. Is that the background discussion? It is part of the background discussion. But the Board never says in discussing. I realize as things go here that 3662 is a small change, but nevertheless. Well, the Board does say in its background discussion that DPF has not introduced evidence that supports the square footage in its claim, or otherwise indicates the actual square footage that it painted. We read that as a holistic finding, that there is no evidence to support the actual amount of square footage that was painted, which would go both to the extended job costs as well as the... That doesn't seem right. The ACM report is certainly some evidence. That's the one that measures the joint compound in square footage rather than volumes of buckets? The... It's got to be walls, or whatever you're putting the joint compound on, and you're probably going to paint whatever you put in joint compound. I understand the Board's conclusion to be the ACM report was a methodology for DPF to estimate the wall surfaces that it had painted, but our reading of the Board's holding here is that it had not shown it actually painted the surfaces it is estimating in the ACM report. That's the distinction. Just to get back, and I'll leave you alone on this, what does square footage have to do with 3662 as opposed to 3660? Isn't that the expenses, non-labor and materials or something, component of the extra work? Correct, Your Honor, but if DPF had not proven that it painted beyond the extra work, how could the government be responsible for any extra costs associated from extra work it had not proven to have painted? That's where we see that tied in, although we also agree with the Board's contractual interpretation if you want to address that as well. Let's turn to that. They make a point about Appendix 805. They say that you didn't require them, as part of the cure notice, to paint all the patient rooms, and that suggests that the government itself interpreted the contract as not requiring the painting of all the patient rooms. What's the answer to that? It is my understanding that all of the patient rooms within 2D were actually painted. What are those rooms that are not shown in yellow on 805? And relatedly, what are all the little numbers? The un-yellowed rooms don't seem to have little numbers on them. Can you explain that? No, Your Honor, this is DPF's exhibit. I'm not... This exhibit was essentially rejected as an appropriate estimate by the Board. I cannot interpret it. The marks on here, the highlights, and the handwriting is something that was created by DPF. The drawing itself, I understand, is a VA drawing, but not the marks showing what was and was not painted. Did someone testify about this? I believe Mr. Fleming did, although most of his testimony was discredited by the Board. And I would point out that this 36,880 square feet is inconsistent with the request for equitable adjustment, which is discussed at APPX 16, for example, where DPF's initial claim was that it had painted 34,600 square feet, or exceeded the contract by 17,000. I think we're missing a point here. Mr. Wise's point is that in the cure notice, you did not ask that all the rooms be painted, which suggests that the contract did not require the painting of all the rooms. So what did the cure notice say in terms of what was missing? Did we have some definition of what they were ordered to do that they hadn't done? Your Honor, the cure notice does not specifically mention that there are any patient rooms left to be painted. Our reading of that is that all of them had been painted at that time. I cannot account for the discrepancy in DPF's evidence that it submitted purporting to show that some rooms had not been painted. I guess the answer to this is, at this point, probably pretty clear. Does anybody have any idea where 16,800 comes from? The genesis of that particular number? That is not on this record. I looked at any number of different combinations of numbers and so forth, and I couldn't get any of them to come anywhere near 16,800. Obviously someone, maybe, is it Ms. Butts? Was that the original contracting officer? Ms. Butts was the original contracting officer. Who, sadly, did not testify. She had retired at that point. That doesn't make her unavailable, I suppose. She was equally unavailable or available to both parties at that point. In any event, someone had the idea that 16,800 means something. Is there absolutely nothing in this record that gives us even the slightest hint as to where to look for some correspondence between that and something that has some relation to this contract? I believe the VA witnesses unanimously testified that it was their understanding, mistaken as it may have ultimately been, that 16,800 square feet referred to the floor area of Ward 2D. Which was actually around 10,000, I think, right? That is what the Board found, but the testimony on which the Board relied, which was the contracting officer representative, Mr. Scott, I believe, he testified that he measured the floor square footage of the patient rooms and corridors that were covered by the contract. And those totaled approximately 10,000, I forget the exact number, but 10,000-something. Which is slightly different than the Boards holding that Ward 2D encompassed 10,000 square feet. But still, the number 16 is nowhere close to 16,800. Yes, Your Honor, but if you were to refer to the drawing that was submitted with, I believe it was Amendment 2 of the contract in response to the questions and answers, there are many rooms within Ward 2D that are not patient rooms. I don't know that that gets us anywhere close to 16,800 at the end of the contract, but that's not on the record here. But even if Your Honors were to want to give credit to the ACM report or anything else, it is still DPF's burden to show that this factual holding was arbitrary and capricious or not supported by the record. And that is just a burden they have not met in this instance. I will quickly address the acceleration claim, where again, DPF failed to acknowledge the Board's alternative holding that even if this wasn't proper anticipatory repudiation, that DPF had in fact caused its own acceleration of the contract by refusing to credit the VA's offer to clarify that the contract would remain open until November, and it refused to do so. If the panel doesn't have any other questions for us, we would respectfully request that you affirm the decision. Thank you. Going back to the 16,800 square feet, the undisputed evidence before the Board was that it was paintable wall space. That was confirmed by Doug Fleming's testimony. Karen Butts, who was the original CO, had that understanding, and there was an original statement based upon Doug Fleming's testimony. But they didn't believe him. Well, Judge Sheridan was the one who heard all the evidence on that. He testified about his dealings, his prior dealings with the first CO on the job, who was Judy Cranzano, and that's at Coatesville, Pennsylvania Project, where the same issue came up, what is required under a painting contract? And the same understand between Judy Cranzano and Doug Fleming is that it refers to paintable square feet. Karen Butts had the same conversation as testified by DPF, but that's the only evidence that was before the Board. And they had every opportunity to call Karen Butts. I wasn't the trial attorney below, but the omission by party appointment comes in as evidence, and for them to completely disregard it without even asking about it. In fact, the only contracting officer who testified was Teresa Moyer. Now, Michael Scott was the COR. He also testified. Neither one of them had any conversations with Karen Butts about what the 16,800 square foot meant. And in fact, when the issue first came up and we're asking, we've reached the limit, the 16,000, 18,000 square feet, there was instructions given to Michael Scott to go find out, has he painted more than the 16,800? Michael Scott, who had no painting experience whatsoever, went out there and measured the floor space. The floor space came in at approximately 10,000 square feet, which is entirely consistent with the estimate that Doug Fleming gave with Appendix 858. He said that there was approximately 10,000 square feet of vinyl tile floor removal and replacement, and approximately 16,000 to 20,000 in paintable wall space. Okay, Mr. Wise, I think we're out of time. Thank you. All right. Thank you. Thank you very much for your time. Thank you very much, counsel. I appreciate the additional time. Thank you.